IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, DISTRICT 1199P, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 07-1166 |
| vs. | ) ) ) | Judge David Stewart Cercone/ Magistrate Judge Amy Reynolds Hay |
| ALIQUIPPA COMMUNITY HOSPITAL, Defendant. | ) ) ) | |

REPORT AND RECOMMENDATION

I.   RECOMMENDATION

Plaintiff, Service Employees International Union, District 1199P ("the Union"), commenced this action against Aliquippa Community Hospital ("ACH") pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, seeking to vacate, in part, and enforce, in part, an arbitration award ("the Award") issued in August of 2007, regarding a grievance filed by the Union over pension contributions owed by ACH. Presently before the Court is the Union's motion for summary judgment, in which it argues that the Award should be confirmed insofar as ACH was found liable for retroactive pension benefits from October of 2006 going forward, and vacated to the extent the Award denied pension benefits from June 30, 2004 through October of 2006. Also pending is ACH's motion for partial summary judgment in which it argues that the court cannot properly vacate the portion of the award contested by the Union and, thus, that portion of the Union's complaint should be dismissed. For the reasons set forth below, it is respectfully recommended that plaintiff's motion for summary judgment [Dkt. 18] be granted, and defendant's motion for partial summary judgment [Dkt. 19] be denied.

II.     REPORT

        The record demonstrates that the Union and ACH have been parties to a series of Collective Bargaining Agreements ("CBA"), the most recent of which was in effect from February 5, 2005 through June 30, 2008.  See Plaintiff's Concise Statement of Undisputed Material Facts ("PSOF"), ¶ 1 [Dkt. 22]; Defendant's Concise Statement of Material Facts ("DSOF"), ¶ 1 [Dkt. 25].  See Plaintiff's Revised Appendix ("Pl.'s App.") B: Award, p. 3 [Dkt. 23].  In 2001, the Union and ACH incorporated into the CBA a single-employer defined pension benefit plan ("2001 Pension Plan"), into which ACH was obligated to make contributions.  It is undisputed, however, that ACH failed to make any such contributions and, in September of 2002, filed for bankruptcy under Chapter 11.  PSOF ¶¶ 2, 3, 13, 16; DSOF ¶¶ 2, 6.  See Award, p. 1; Defendant's Answer ¶ 15 [Dkt. 5].  The Pension Benefit Guarantee Corporation ("the PBGC") consequently terminated the 2001 Pension Plan and became its statutory trustee.  PSOF ¶ 4.  See Award, p. 1, 2-3.

        On April 9, 2004, ACH emerged from bankruptcy and the parties agreed to a reorganization plan which was confirmed by the Bankruptcy Court on August 23, 2004.  DSOF ¶ 3.  See Award, p. 1; Pl.'s App. D: Confirmation Order, Exh. D: 4/8/2004 Memorandum Agreement.  In addition to including the terms of ACH's settlement agreements with its creditors, the Confirmation Order deemed the 2001 Pension Plan terminated as of June 30, 2004.  PSOF ¶¶ 5, 6.  See Award, pp. 1-2; Confirmation Order ¶ 9.  The PBGC, however, agreed to pay pension benefits to employees for those benefits which accrued during the life of the 2001 Pension Plan ending June 30, 2004, thereby extinguishing any claims of the Union or the employees for ACH's unpaid contributions to the 2001 Pension Plan.  PSOF ¶¶ 7, 8.  See Award,

pp. 1-2; Confirmation Order ¶¶ 9, 10. It also appears that ACH agreed to participate in a new multi employer defined benefit plan, the Service Employees International Union, National Industry Pension Fund ("NIPF"), and to make contributions to the NIPF beginning on June 30, 2004, the date the Court deemed the 2001 Pension Plan terminated, going forward. PSOF ¶ 9; DSOF ¶ 4. See Award, p. 2-4; Confirmation Order, Exh. D: Memorandum of Agreement ¶ 4.

On February 5, 2005, ACH and the Union incorporated the terms of the bankruptcy settlement into a new CBA and negotiated the specific terms of ACH's obligations under the NIPF. PSOF ¶ 10. See Pl.'s App. A: CBA, Article 19.1;[1] Appendix J. Under Appendix J of the CBA, ACH was required to contribute to the NIPF $.60 per hour worked for each employee "[a]s of, and retroactive to, the date of Plan Termination," which was June 30, 2004. CBA, Appendix J. See PSOF ¶ 11; DSOF ¶ 5. Appendix J also states that the NIPF "and all contributions remitted to same, will become effective retroactively to June 30, 2004 except as otherwise and explicitly agreed to herein." CBA, Appendix J. See PSOF ¶ 12.

It s undisputed that ACH again failed to make any contributions for its employees to the NIPF. PSOF ¶¶ 3, 13, 16. See Def.'s Answer ¶ 15. Consequently, the Union filed a grievance and the matter ultimately proceeded to arbitration. PSOF ¶ 14; DSOF ¶¶ 8, 9. The arbitrator issued the Award on August 3, 2007, finding that ACH's obligation to begin making contributions to the NIPF was contingent on the PBGC terminating the plan and its trusteeship

---

[1]Specifically, Article 19.1 of the CBA provides:
    (a) The Hospital agrees to participate in, and contribute to, for all
    eligible bargaining unit employees, the Service Employees International
    Union, National Industry Pension Fund, subject to the terms set forth in
    Appendix J.

3

and that because the PBGC continued to make benefit payments under the 2001 Pension Plan until October 2006, it effectively extended the date that ACH was to begin making contributions to the NIPF until that date. PSOF ¶¶ 15, 17, 18; DSOF ¶¶ 12, 13. See Award, pp. 6-8. As such, the Arbitrator awarded the Union pension contributions to the NIPF from October 2006 going forward, but denied them for the period between June 30, 2004 and October 2006. PSOF ¶ 20; DSOF ¶ 11. See Award, p. 8.

The Union instituted this action on August 24, 2007, asking the court to confirm the portion of the Award requiring ACH to make contributions to the NIPF from October of 2006 going forward, and to vacate the portion of the award denying pension contributions for the period between June 30, 2004 and October 2006. The Union has presently filed a motion for summary judgment arguing that it is entitled to the relief it seeks as a matter of law. ACH has filed a motion for partial summary judgment arguing only that it is entitled to judgment on the portion of the award the Union seeks to have vacated.

"The scope of judicial review of an arbitration award is narrowly circumscribed. Because the arbitrator's construction of the collective bargaining agreement is bargained for, a court is not free to vacate an award because it views the merits differently." United Indus. Workers v. Government of the Virgin Islands, 987 F.2d 162, 170 (3d Cir. 1993), citing W.R. Grace and Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers of America, 461 U.S. 757, 764 (1983). See Major League Umpires Association v. American League Professional Baseball Clubs, 357 F.3d 272, 280 (3d Cir. 2004), cert. denied, 543 U.S. 1049 (2005) ("Major League Umpires"). Thus, in considering a challenge to an arbitration award the court "is not to correct factual or legal errors made by an arbitrator," but is

4

to assess only "whether the award 'draw[s] its essence from the collective bargaining agreement.'"  Major League Umpires, 357 F.3d at 279-80; Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1295 (3d Cir.), cert. denied, 517 U.S. 1251 (1996), quoting W.R. Grace and Co. v. Local Union 759, 461 U.S. at 766.  An award will satisfy this standard where, "the interpretation can in *any rational way* be derived from the agreement, viewed in the light of its language, its context and any other indicia of the parties' intention."  Major League Umpires, 357 F.3d at 280, quoting United Transportation Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 379-80 (3d Cir. 1995).  See Pennsylvania Power Co. v. Local Union No. 272, Intern. Broth. of Elec., 276 F.3d 174, 178-79 (3d Cir. 2001), cert. denied, 536 U.S. 959 (2002), quoting United Paperworkers International Union, AFL-CIO v. Misco, Inc. 484 U.S. 29, 38 (1987), and Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d at 1295 (Finding that the Supreme Court has made it clear "that an 'arbitrator may not ignore the plain language of the contract,'" and that "where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop," a reviewing court can vacate the award).

    The Union initially argues, and ACH does not dispute, that the portion of the Award wherein the arbitrator found ACH liable for unpaid contributions retroactive to October of 2006, is in keeping with the plain language of the CBA, thereby drawing its essence from the agreement, and should be confirmed.

    Indeed, as previously discussed, under the terms of the CBA, ACH agreed to make contributions to the NIPF in the amount of $.60 per hour worked for each employee retroactive to June 30, 2004.  It is undisputed that no such contributions have been made which

necessarily means that contributions are owing retroactive to at least October of 2006. Thus, to the extent the arbitrator found ACH liable for contributions retroactive to October 2006, the Award appears to "draw its essence" from the CBA, and is properly confirmed.

The Union also argues, however, that the portion of the Award denying pension contributions from June 20, 2004 to October 2006, does not draw its essence from the CBA and should, therefore, be vacated. Specifically, the Union contends that the arbitrator's reliance on extra-contractual events and imposition of a condition precedent to ACH's obligation to make pension contributions ignores the plain language of the CBA and is otherwise unsupported by the record. We agree.

As previously discussed, the CBA specifically provides that, "[t]he Hospital agrees to participate in, and contribute to, for all eligible bargaining unit employees, the [NIPF], subject to the terms set forth in Appendix J." Appendix J, in turn, provides that the NIPF "and all contributions remitted to same, will become effective retroactively to June 30, 2004 except as otherwise and explicitly agreed to herein," and that ACH is to contribute to NIPF $.60 per hour worked for each employee "[a]s of, and retroactive to, the date of Plan Termination." PSOF ¶ 11, 12; DSOF ¶ 5. See CBA, Appendix J. As reflected in the Bankruptcy Court's Confirmation Order, the Plan was deemed terminated by the parties effective June 30, 2004, in order to quantify the PBGC's claims. Confirmation Order ¶ 9. See Award, pp. 1-2. Moreover, not only does ACH concede that under the terms of the CBA it was to begin making contributions to the NIPF as of June 30, 2004, but the arbitrator acknowledged in the Award that:

> The Agreement on its face seems clear. It refers to the "now defunct" pension plan, provides for Hospital participation in the NIPF, and provides for the hospital to make contributions of 60

cents for each employee hour paid. All of this was to be effective
and retroactive to June 30, 2004, which is referred to as the date of
plan termination.

Award, p. 7. See DSOF ¶ 5.

Despite the perceived clarity of, and the unambiguous language in, the CBA that ACH's contributions to the NIPF were to be retroactive to June 30, 2004 unless "otherwise and explicitly agreed to herein," the arbitrator determined that they were only retroactive to October of 2006. In order to arrive at that date, the arbitrator determined that ACH's obligation to make pension contributions to the NIPF retroactive to June 30, 2004, was somehow altered "by the actions of the PBGC and the parties." Award, p. 7. Specifically, the arbitrator found that ACH's obligation to contribute to the NIPF was contingent on the PBGC ceasing to make pension benefit payments, and that because the PBGC continued to make benefit payments through October of 2006, ACH had "no reason to participate in the NIPF" until that date. The arbitrator concluded that, "[t]o order [ACH] to make retroactive contributions [to June 30, 2004,] would afford the NIPF a windfall not anticipated by the Agreement." Award, p 8.

The CBA, however, does not provide for such a contingency. Nor is there any evidence of record which would support a finding that the parties "explicitly agreed" at any time to change the date they had bargained for whereby ACH would become responsible for contributions to the NIPF.[2] It therefore appears that the arbitrator ignored the plain language of the CBA and, thus, it cannot be said that the Award in this regard draws its essence from the CBA. Accordingly, to the extent the arbitrator denied contributions from June 30, 2004 through

---

[2]Moreover, as argued by the Union, the PBGC is not a party to the CBA. As such, it is difficult to see how its actions, i.e., continuing to pay pension benefits through October of 2006, could be seen as altering the terms of the CBA as agreed upon by "the parties."

7

October 2006, that portion of the award is properly vacated.  See  See Pennsylvania Power Co. v. Local Union No. 272, Intern. Broth. of Elec., 276 F.3d at 178-79.

ACH nevertheless urges the court to uphold the Award disallowing contributions to the NIPF retroactive to June 30, 2004, arguing that the NIPF received all that is was entitled to and suffered no loss for the period between June 30, 2004 and October 30, 2006, as evidenced by the arbitrator's findings that the PBGC had made the pension contributions at issue between those dates.  ACH contends that the Union's failure to present any evidence that the PBGC did not pay the contributions between June 30, 2004 and October of 2006, is fatal to the Union's position.

The difficulty with ACH's argument, however, is twofold.  First, regardless of the arbitrator's findings with respect to the payments being made by the PBGC, it does not negate the fact that the express, bargained-for provisions of the CBA provide that ACH was to make contributions to the NIPF retroactive to June 30, 2004, and that there is no evidence that the parties ever explicitly agreed otherwise.

Second, the arbitrator did not find that the PBGC made pension *contributions* between June 30, 2004 and October 30, 2006, as ACH has argued.  Rather, he found that "the PBGC continued to pay pension *benefits* under the Hospital Plan ... until October 2006."  Award, p. 7.[3]  Indeed, not only did the arbitrator quote the Bankruptcy Court's Confirmation Order, wherein it noted that, "PBGC will pay pension plan benefits accrued under [the old] pension plans," but he also noted elsewhere that the Court "anticipated that the PBGC would continue to

---

[3] Review of the Award demonstrates that the arbitrator has referred to the old 2001 Pension Plan as "the Hospital Plan."  See Award, pp. 4, 5.

8

pay pension benefits until the plans were formally terminated." Award, pp. 1, 6.

The arbitrator's finding in this regard is significant because, as the Union persuasively argues, the benefit payments made by the PBGC and the contributions that were to be made by ACH retroactive to June of 2004, are separate and distinct from one another and serve entirely different purposes. Indeed, it is undisputed that the PBGC agreed to make pension benefit payments to employees whose benefits had already accrued under the old 2001 Pension Plan, and ACH agreed to make contributions to the new NIPF which was a separate fund for employees who had not yet retired based on the hours they worked from June 30, 2004, going forward. Those contributions would then fund the pension benefits that would eventually be paid to those employees when they retire.

Given this distinction, it is difficult to see how the arbitrator could find that the PBGC made pension *benefit* payments through October of 2006, and at the same time reach the conclusion that the NIPF would receive a windfall if ACH was still required to make *contributions* to the NIPF retroactive to June 30, 2004. If anything, as pointed out by the Union, it would appear that the NIPF will be in a deficit when the current employees retire if ACH is relieved of its obligation to make contributions for the hours they worked between June 30, 2004 and October of 2006. The fact that these findings are irreconcilable, of course, only lends credence to the Union's argument that the arbitrator conflated the concepts of benefits and contributions and erroneously concluded that the benefits the PBGC had been paying to retirees were, in fact, contributions to the NIPF.

Significantly, ACH has not addressed the Union's argument that there is a distinction between pension *benefits* paid to retired employees whose benefits had already

9

accrued under one plan, and pension *contributions* paid into a fund under another plan in order to finance pension benefits for current employees when they retire. Nor does ACH dispute the Union's argument that the arbitrator confused the two. Rather, ACH contends that the Union should have presented evidence that the PBGC was not paying the contributions and reiterates the arbitrator's finding that the NIPF would receive a windfall should ACH be required to make contributions retroactive to June 30, 2004. ACH then concludes that the Award in this regard draws its essence from the CBA merely because the arbitrator "refers to, quotes and even attaches portions of the CBA." Defendant's Brief, p. 3 [Dkt. 20].

Neither ACH, nor the arbitrator, however, has pointed to any language in the CBA or to any other evidence which would suggest that the PBGC was to pay *contributions* into the NIPF for worked performed by employees after June 30, 2004, and the mere reference to the CBA does not alter that fact.[4] Moreover, the fact that the Union did not present evidence to prove that the PBGC was not paying contributions to the NIPF when such payments were never contemplated by the parties and, by the arbitrator's own findings, never occurred, does not appear particularly significant. Thus, not only does the arbitrator's interpretation of the CBA ignore the plain language of the agreement but his findings with respect to the PBGC's payments are also inconsistent with its terms. Under these circumstances, it cannot be said that the Award is derived from the agreement in any rational way or that it draws its essence from the agreement

---

[4]Moreover, the Union has set forth in its concise statement of facts, which ACH has not countered, that "the PBGC agreed to pay pension benefits to employees for those benefits which were accrued during the life of the 2001 Pension Plan ending June 30, 2004," and ACH itself has represented it its own concise statement of facts that "[t]he PBGC continued to pay pension benefits until October 30, 2006." PSOF ¶ 7; DSOF ¶ 7. Under these circumstances, ACH cannot now contend that the PBGC was, in fact, making contributions to the NIPF.

and that portion of the Award disallowing the Unions' grievance for pension contributions retroactive to June 30, 2004, is properly vacated.

For these reasons, it is recommended that plaintiff's motion for summary judgment [Dkt. 18] be granted, and defendant's motion for partial summary judgment [Dkt. 19] be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are permitted to file written objections and responses thereto in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

*/s/ Amy Reynolds Hay*
United States Magistrate Judge

Dated: 26 August, 2008

cc: Hon. David Stewart Cercone
United States District Judge

All Counsel of Record by Notice of Electronic Filing